1822.

MUMFORD
v.
MURRAY.

MUMFORD and others *against* J. B. MURRAY.

The plaintiff and defendant were partners; and the defendant, while in *Europe*, obtained an order in favour of himself and his co-partner, on a house in *London*, but suffered the moneys, received under it, to be blended with other moneys received under a trust deed to him and *C.*, and part of it to go into the hands of *C.*, his co-trustee; and the plaintiff, without knowledge of the facts, afterwards, on a settlement of accounts, joined in a release of *C.*: *Held*, that the defendant, who wrongfully kept the plaintiff in ignorance of the existence of the order, and of his rights under it, was accountable to him for his interest in the whole moneys received under the order.

*December 21.*

PETITION, *November* 4th, by the defendant, for a rehearing; (see the same case, *ante*, p. 1—10.) for the purpose of producing in proof a certain letter, from *John P. Mumford*, the intestate, which had not been made an exhibit, and read at the former hearing of the cause. The defendant, also, filed a cross-bill, praying, that the plaintiffs might discover the contents of that letter, or produce it. The plaintiffs answered the *cross-bill*. An order for a rehearing having been granted on the 5th of *November*, the cause was reheard on the 2d and 3d of *December*, when the petition, cross-bill, and answer, were read, and, also, an agreement, dated *August* 2d, 1809, and various other papers, which had been read in the suits of *James V. Murray*, against the defendant, *J. I. Clark*, &c., and of *Riggs* and others, assignees of *Robert Murray*, against the same defendants and *J. V. Murray*; and the affidavit of the defendant, dated the 8th of *December*, 1817, and his several answers and petition of appeal in those causes.

The material facts contained in these voluminous documents, are stated in the opinion delivered by the Court.

*Hoffman*, and *R. Sedgwick*, for the defendants, made the following points.

1. That *John P. Mumford* had notice of the order, drawn by *Robert Murray & Co.* on *Charles Murray*, mentioned in the pleadings, soon after it was drawn, or of an assignment of the subject matter of that order.

2. That the money received, under that order, was partly received by the defendant, and partly by *John I. Clark*, and was mixed by them with the money they received under the deed of assignment of *March*, 1798, mentioned in the pleadings, and which fact was known to *John P. M.*

3. That the money received by *John I. C.*, under the said order, was included in his accounts, which were settled before the master, as stated in the pleadings; and that the settlement made with the executors of *John I. Clark*, stated in the pleadings, and the release thereupon executed to the said executors, to both of which *John P. M.* was a party, concludes him from making the defendant liable for the money, or any part of it, received by *John I. C.*, under the order; and that the former decree ought to be altered and modified accordingly.

*S. Jones*, and *H. W. Warner*, for the plaintiffs.

*December* 21. The cause stood over for consideration until this day.

THE CHANCELLOR. The rehearing was prayed for, and granted, in this case, for the purpose of giving in evidence a letter from the defendant to the intestate, *J. P. M.*, dated at *Paris*, in 1797, and which, by mistake, or by reason of some misunderstanding between the solicitors, was not made an exhibit, and read in evidence at the former hearing.

The receipt of the letter was acknowledged by *J. P. M.*, on the 4th of *November*, 1797, and it has been pro-

duced, and read upon the rehearing. The question now raised and discussed is, whether that letter contained suffi- cient notice of the order upon *Charles Murray*, mentioned in the former decree, to conclude *J. P. M.*, and his repre- sentatives, from charging the defendant with any part of the moneys received by *John Innes Clark*, under that order.

The order was drawn by *Robert Murray & Co.*, and purports to bear date at *New-York*, *June* 24th, 1797, and was drawn upon *Charles Murray*, at *London*, in favour of the defendant. It directed him, " to pay to the defendant, or order, 24,000 pounds sterling, or as much as he might receive on their account, by virtue of their claims on the *British* government, for property taken on board the barque *Two Brothers*, the snow *Harmony*, the brig *Rachel*, the schooner *Ariel*, and the ship *Favourite*, by the ships or vessels of his *Britannic* majesty, and which claims the said *Charles Murray* was authorized, as their attorney, to make on their behalf, under the treaty of amity and commerce, &c. for value by them received of the defendant."

I assume it to be a fact, conceded throughout the case, that the house of *Robert Murray & Co.* was, at that time, insolvent, and was largely indebted to the defendant, and to the house of *Murray & Mumford*, for debts previously contracted, and responsibilities assumed. The order con- tained no direction as to the application of the funds co- vered by it, and the defendant had, consequently, a just right to apply them, when received, to the payment of those debts, and to the discharge of those responsibilities. The order must be presumed to have been intended for those purposes, and the defendant had no right to apply them to any other purpose, so far as the house of *M. & M.* was interested in the application of those funds, until that purpose was answered. The defendant, in an affida- vit, made and read in this Court, on the 8th of *December*, 1817, (and which is an exhibit in this cause,) stated, that

previous to, and at the time of the failure of *Robert Murray & Co.*, they had dealings with the defendant, in his separate capacity, and with the house of *Murray & Mumford*, and that all the debts and responsibilities charged in the account exhibited before the master, in the cause of *Riggs and others against the defendant*, by the defendant, and by *M. & M.*, against *Robert Murray & Co.*, were due, and the responsibilities incurred, before the date of the order. It was stated, in the report referred to, that there was due to the defendant, and to *M. & M.*, from the house of *Robert Murray & Co.*, after all credits allowed, on the 1st of *September*, 1814, the sum of 95,688 dollars 25 cents, and which, with interest, amounted, at the date of the report, on the 1st of *July*, 1816, to 102,548 dollars. I refer to this fact merely for the purpose of showing, what I have assumed to be undisputed, that the claims of the defendant, and of the house of *M. & M.*, at the time of the order, were co-extensive with it in amount. The defendant stated further, in the affidavit referred to, that he went to *Europe*, in 1797, at the request of *Robert Murray & Co.*, to aid in the recovery of their property, and the prosecution of their claims upon the *British* government, and their claims against *Bird, Savage & Bird*, and " under an agreement, that what he might receive in the premises should be retained and credited on account of debts and responsibilities, as well of himself, as of *Murray & Mumford*."

This admission of the defendant coincides with the necessary import and legal operation of the order, and shows, conclusively, that the order was drawn and accepted for the benefit of himself, and of the house of *M. & M.*, of which he was a member, as creditors of the house of *Robert Murray & Co.* He says further, in that affidavit, that the moneys received from the *British* government were " actually and in truth received under the order or authority directed to *Charles Murray*, and through whom

*1822.*

MUMFORD
v.
MURRAY.

the said payment (referring to the sum of 31,699 dollars 80 cents, which he had previously mentioned as received on account of the claims of *Robert Murray & Co.* upon the *British* government) was made to his agents in *London.*"

The main question agitated upon this rehearing, now occurs : had *J. P. M.* due and seasonable notice of this order, so as to preclude him, in consequence of his subsequent discharge to the executors of *J. I. Clarke,* from calling on the defendant to account for the entire proceeds of that order, according to the legal effect of it ?

The defendant, in a letter, dated at *Paris, August* 10th, 1797, after a long and desultory detail of his complaints and misfortunes, adds, under the date of the 13th, these words : " I have at length got an assignment of claims on the *British* government, which, by their calculation, amounts to about 22,000 pounds sterling, as security for your and my bail for *Wheaton & Jonathan Russell,* for my bills on *B. S. & B.,* drawn last year, about 2400 pounds sterling, which Mr. *Clarke* and I are accountable for, our endorsements to *Maule & Bullock,* the residue, which will be nothing, is to be divided between *C. & N., L. & T.,* and ourselves." The order was upon *Charles Murray,* the agent of *Robert Murray & Co.,* and this letter is silent as to the nature of the instrument, or on whom drawn, and only says, " I have got an assignment of claims." The order was upon specific property, on board of five vessels, particularly named, and the letter is silent as to the specification of the funds, and only says, " claims on the *British* government." The order was for 24,000 pounds sterling, or as much as the agent might receive, and the letter varies on this point, and only says, that, " by their calculation, the claims amount to about 22,000 pounds." The order was without appropriation of the funds to any specific object, and left them to be applied according to the previous agreement, and the legal effect of the order, to the

entire debts and responsibilities of the defendant, and of *M. & M.* The letter diverts the funds to other objects and persons, and says, that the assignment was given as security for one particular engagement of his own, viz. the bills on *B. S. & B.*, and for two particular responsibilities of *M. & M.*, viz. their obligation as bail for *Wheaton & Russell*, and their endorsements to *M. & B.;* and that the residue, "which would be nothing," was to be divided between *C. & N.*, and *L. & T.*, and themselves. And could the defendant have written this letter, with the order in question before him? It is a mutilated, inaccurate, and deceptive account of the contents of the order, if, indeed, it did in fact refer to the order in question. The defendant asserts, in the petition for a rehearing, that the order, notwithstanding its date, was written at *Paris*, and drawn by one of the house, then there with him, and was drawn at or about the time of the date of his letter of the 13th of *August*, 1797. Why, then, it may be asked, did he not furnish his partner with a copy of the order, and let it speak for itself? It would have been as easy to copy the order, as to give the very erroneous account of it, which has been mentioned. In the affidavit already referred to, the order is set forth at large, and he there states, that it was given upwards of eight months before the date of the trust deed of the 23d of *March*, 1798. This would carry back the time of giving the order beyond the 23d of *July*, 1797; but assuming it to have been really drawn on the 13th of *August*, 1797, when he wrote the addition to the letter under that date, it is altogether unaccountable, upon any fair and reasonable ground, why the true nature and character, and terms and value of the order, should have been so entirely misrepresented, and that, too, to the prejudice of the rights and interest of his partner, when the order itself must have lain under his eye. It would not seem to be very just or reasonable, for the defendant now to be enabled to say, by the aid of this Court, that the pa-

1822.

MUMFORD
v.
MURRAY.

ragraph in that letter was, of itself, notice to *J. P. M.* of that order, sufficient to charge him with a waiver of his claims under it against the defendant, for a misapplication of the funds, when he made the agreement with the executors of *J. I. C.* in 1809.    There is good reason to believe that *J. P. M.* never understood or appreciated his interest under that order, and that the representation in the letter was so inaccurate and so delusive, as to throw him entirely off his guard, and to mislead him as to the value of his rights.

At the time of the drawing of the order, *M. & M.* were large creditors of the house of *Robert Murray & Co.,* and that house had then failed, charged with debts exceeding 700,000 dollars, and *Robert Murray,* the head of the house, was then in prison in the city of *New-York.*    These facts appear in the pleadings, in the cause of *Riggs* v. *Murray,* so often referred to by the defendant in the course of this cause.    It was, therefore, extremely important to the house of *M. & M.* to have a valid lien, in preference to other creditors, upon the proceeds of the property taken on board of the five vessels named in the order, and then in the possession of the *British* government.    That lien the house of *Robert Murray & Co.* agreed to give before the defendant went to *Europe,* and that lien, or security, was given, to the amount of 24,000 pounds sterling, by the order on *Charles Murray.*    The moment that order was drawn and received, it became the duty of the defendant to act under it effectually, and to give his partner a true and full account of the security.    His partner had a great stake and interest in the faithful performance of that trust, and I regret to say, that I am obliged to draw a very unfavourable inference, from the manner in which that order was treated, and the letter dictated, which is now set up as a full and sufficient notice of the order.    The order was not stated truly.    Information was withheld as to the character of the assignment, and as to the specific

property covered by it, and as to the nature and amount of the interest of *M. & M.* in it. The order was stated untruly, when it was represented as covering the interest of third persons, and when the residuary interest of *M. & M.* was exhibited as of light and casual importance.

It is remarkable, that the defendant never mentioned or alluded to the order, or to any assignment of claims on the *British* government, in any part of his subsequent voluminous correspondence with his partner. The answer of the plaintiffs, to the cross-bill, filed to obtain discovery of the letter of the 13th of *August*, refers to as many as sixteen letters, (and which are in proof,) from the defendant, written between *August*, 1797, and *January*, 1799 ; and there is not, in one of them, the most distant allusion to that order. This is very surprising. Here was an absolute lien obtained from a bankrupt house, to the value of 24,000 pounds sterling, upon specific funds, in favour of the defendant, and of him and his partner, and yet not one solitary word of consolation is given to his partner, by allusion to this order, though his letters are replete with pathetic representations of their losses, disappointments, responsibilities, distress, and ruin. On the contrary, those letters most manifestly and strongly discouraged *J. P. M.* from expecting any relief from any of the resources of *Robert Murray & Co.*, in *Europe*, and suggested various modes of providing for some of the trusts, which he had specified in his letter of the 13th of *August*, as provided for by the assignment. Thus, in his letter, dated *August* 16, 1797, he states to *J. P. M.*, " that he will have to provide for *M. & B.'s* suit in *New-York*, and must use the funds arising from the sale of all property from this country." This, we are to observe, was one of the responsibilities which he had stated as being provided for by the assignment. So, in his letter of the 17th of *August*, 1797, he says, " We have received accounts from *C. M.*, which contain such information as gives us all reason to hope, that the money in *B., S. & B.'s*

hands, will yet be released from the attachments, and made subject to the disposal of *R. M. & Co.* If so, we are safe." It is worthy of notice, that here also he silently passes by the recent assignment as a thing of no import-ance, and on which none of his hopes rested. In his let-ter of the 20th of *August,* 1797, he says, " I am promised here, that every thing in *America* shall go to the discharge of *M. & B.'s* bill." He also adds, in relation to the being bail for *Wheaton,* " my very bread depends on the arri-val of *J. R. W.* before the 18th of *October.*"

All those letters are stated in the answer to the cross-bill of discovery, as having arrived at the same time, and in the same vessel with the letter of the 13th of *August;* and, it requires but very ordinary observation to perceive, how extremely well calculated those letters were to detach the mind of *J. P. M.* from placing any reliance or im-portance on the assignment, stated, in the letter of the 13th of *August,* to have provided for those objects.

In his letter of the 30th of *August,* 1797, dated at *Lon-don,* he says, his " journey to *Paris* had been attended with as little success as he could have expected. Indeed, no one has been there to much less purpose, as I have not realized as much as my expenses. I have some distant views of success, but so little confidence have I a right to place in those for whom we have hazarded so much, that I will not be sure of any thing, till I have it in hand. I again repeat, that you and *R.* must take care of *M. & B.'s* bills, as no effort will be made in *Europe* by those who have had it in their power, so long ago, to have pro-vided for it, and who, during my stay with them, never ac-quiesced in any one proposal of mine, except that of my coming away."

This letter, it will be observed, was written from *Lon-don,* where *Charles Murray,* on whom the order was drawn, resided, and not one word is said about it, nor whether it was presented; and, he loudly complains, that nothing

had been done for him, or was to be expected. And yet, it was but a few days before that time, that one of the house of *Robert Murray & Co.*, while he was at *Paris*, had given him an order, according to agreement before he left *New-York*, on funds belonging to that house ; and he admits, in one of his answers in this suit, that funds to the amount of 19,393 pounds, seven shillings, and one penny, sterling, were realized from the property covered by that order.

Again ; in his letter of the 16th of *December*, 1797, he says, that " the sum recovered against *J. R. W.'s* bail, is about the amount I expected, to the satisfaction of which, must be applied the property in the *Ariel*, and such other as *Robert* shall point out. If this is not done, my other property will be sacrificed, and my family distressed." It is to be observed, that this bail responsibility was one of the subjects which he stated in the letter of the 13th of *August*, as provided for by the assignment ; and this letter must have impressed his partner with the belief, that the provision was of no avail, for *Robert Murray* was to *point out* the property to be applied to it. This property of the *Ariel* was, likewise, part of the specific property covered by the order, and yet no notice was given to his partner of that fact.

In his letter of the 17th of *February*, 1798, he says, " I am at a loss to account for the idea which you seem to entertain, of putting in execution such various plans, since I have been so very explicit in stating to you *the entire deficiency of every resource that was contemplated when I left home.* When my situation will be bettered, if ever, I begin to doubt, since every resource of our own, and *to none other have we to look*, has not failed to be attended with unprecedented disappointments."

His numerous letters are filled with language of the like import ; and, to assume, that the defendant has a right to charge *J. P. M.* with being duly apprized by him of the

contents, and, consequently, of the force and effect of the order on *Charles Murray*, would be to act without any colour of reason or justice, and directly against the truth of the fact.   The defendant now says, in his petition for a rehearing, that he never presented the order to *Charles Murray*, and that it was never, in any manner, acted upon ; and yet, in his affidavit, in 1817, he swears, that all the moneys received from the *British* government were actually, and in truth, received under it, and that, through *Charles Murray*, the payments were made to his agents in *London*.   The inconsistent stories, and the contradictory assertions of the defendant, in respect to that order, are truly astonishing.   Let us attend, for one moment, to the various statements of the defendant on that subject.

In his first answer in this suit, he says, that the 31,699 dollars 80 cents, credited to the trust estate, in the account (A.,) were received from the *British* government on account of illegal captures, made by *British* subjects, of the property of *Robert Murray & Co. ;* and were received under a *lien* made or created on that fund by *Robert Murray & Co.,* in favour of the defendant, prior to the execution of any of the trust deeds.   He says, also, that *M. & M.* ought to be credited with the balance of that sum, after deducting certain charges, mentioned in schedules (G.) and (H.,) and that the *cestui que trusts*, mentioned in the fifth clause of the trust deed of the 31st of *May*, 1800, are not entitled to any portion of that sum.

The admissions in this answer, appear to me to destroy all pretence of a waiver by *J. P. M.,* of his right as a partner, to the funds received under that order, for it is admitted, that the house of *M. & M.* was entitled to the 31,699 dollars 80 cents, as part of the proceeds of the property covered by the lien ; and, if they were entitled to that part, they were equally entitled to the whole sum of 19,393 pounds, 7 shillings and 1 penny, sterling, which is admitted, in the third answer, to have been received from the proceeds

of the property covered by the order. The claim to the
whole rests precisely on the same foundation as a claim to
the part admitted by the answer.    If the *cestui que trusts*,
in the trust deed of 1800, had no right to the 31,699 dol-
lars 80 cents, they had no right to any part of the residue
of those funds.    The inference is irresistible; and it never
occurred to the defendant, when he put in this answer, to
set up the pretence of notice, in 1797, as a bar to the
claims of *J. P. M.*

In his second answer, the defendant sets forth, at large,
the order on *Charles Murray*, as being the lien referred to
in the first answer; and here we have another and a differ-
ent view of the objects of the order from that stated in
the letter of the 13th of *August*, 1797.    He states, that
it was given to secure him against all his liabilities, as bail
for *Robert Murray* and *John R. Wheaton*, and for all other
claims which the defendant might have in his individual
capacity, or as one of the firm of *M. & M.*, against *Robert
Murray & Co.*    He is silent about its being given as secu-
rity for bills on *Bird, Savage & Bird*, and for the en-
dorsements of *M. & M.* for *Maule & Bullock*, and that the
residue was to be divided between *Clark & Nightingale,
Loomis & Tillinghast*, and *M. & M.*    All these objects
are now withdrawn from the purpose of the order, and it
proves, that the character which he gave of the order, in
his letter, in 1797, was fallacious and untrue.    He says,
further, in this answer, that from the great confidence
which subsisted between him and *Robert Murray & Co.*,
it was not deemed necessary to make a particular state-
ment of the manner in which the funds, which might be
received under the order, should be applied, and that *Ro-
bert Murray & Co.* had full confidence, that he would
fairly account with them for all moneys which he might re-
ceive under the order.

What can we say, to such a tissue of contradictions, in
respect to that order, and the funds it covered, as are con-

tained in the letter of the 13th of *August*, 1797, the affidavit of the 8th of *December*, 1817, the first and second answers, and the petition for a rehearing. The language of truth is uniform, and all its accounts will for ever harmonize and agree. To charge *J. P. M.* with notice of that order from that letter only, when we compare the order with the letter, and take, in connexion with it, all the subsequent correspondence, appears to me to be as absurd as it would be unjust.

In his third answer, he says, that he considered, from the general nature of the order, that he had a right to apply the proceeds to secure him against all liabilities for *Robert Murray & Co.*, and all claims which he might have in his individual capacity, or as one of the house of *M. & M.*, against *Robert Murray & Co.*, in such manner as to him should seem meet. That no designation was ever made as to the particular debts or claims which the order was intended to secure or satisfy.

Here we have a still further contradiction of the representation of the order given in the letter of 1797. Now, there was no particular designation of the debts or claims to which the proceeds were to be applied, and this leaves the order to stand, as it was drawn, in its naked simplicity.

These answers do, of themselves, completely destroy all just ground for now setting up the information in the letter, as a sufficient notice to *J. P. M.* of the order.

The defendant admits, in this answer, that he and *J. I. C.*, in 1802, and 1803, as trustees, under the trust deeds, gave a power of attorney to *Thomas Mullett & Co.*, to receive from the *British* government any moneys which should be paid on account of property of *Robert Murray & Co.*, which had been captured, and that *Charles Murray* was ordered to allow all moneys received from the *British* government, on account of property mentioned in the order on *Charles Murray*, to be paid to *Mullett & Co.* He says, that the reason why so large a portion of the

funds of the property mentioned in the order, was permitted to pass to *J. I. C.*, was, that he was ignorant of the amount due from *Robert Murray & Co.* to the defendant, and to *M. & M.*, and he supposed the amount paid by *Thomas Mullet & Co.*, to him, would cover all the claims of the defendant, and of *M. & M.* It was, therefore, with due recollection of the order, and at his own peril, that he suffered the proceeds of the property, covered by the order, to pass into the hands of *Clark*.

From this review of the facts, we are prepared for the decision of the question, whether *J. P. M.* concluded himself, by being a party to the agreement with the executors of *J. I. C.*, in 1809, and to the subsequent release of these executors, in 1810, from now asserting his right to call the defendant to account for the proceeds of the property received under that order, to the extent of the claims of *M. & M.* against *Robert Murray & Co.*, and which the defendant wrongfully, and without the assent or knowledge of his partner, suffered to pass into the possession of *J. I. C.*, and to be appropriated to other objects, under the trust deed of 1800. It is entirely clear to my mind, that *J. P. M.* acted in ignorance of his rights under that order, when he joined in the discharge of the executors of *J. I. C.* He only meant and intended to discharge those executors from claims for moneys which their testator had received, as a *trustee* under the trust deeds of 1798, 1799, and 1800. This is the plain language of the agreement, upon which the release was founded ; and the general language of the release must be construed as intended to be confined to the subject matter of the agreement, and upon which the executors accounted before the master. This was the acknowledged and the only consideration for the release. *J. P. M.* was no party to either of the suits on which that settlement took place, and he is not to be supposed to have inspected the pleadings and proofs in those causes, or to have been informed of the facts in those

1822.

Mumford
v.
Murray.

cases, any further than they were stated in the agreement, and in the release. No further information was requisite for him, and he cannot, in common reason or justice, be chargeable with notice of all the facts involved in the voluminous proceedings in those suits. But, if he had notice of all those proceedings, they would not have given him any information of his rights under the order, for they contained none. The schedules annexed to the answers of *J. I. C.*, and the defendant, set forth an account of moneys received by them in trust, for the purposes specified in the trust deeds; and among the moneys received, the proceeds of the property of the five vessels, covered by the order on *Charles Murray*, were mentioned. But, if *J. P. M.* had seen and read those answers, and the schedules annexed, he would have had no knowledge that the property in those vessels had been covered by the order, for he had never seen the order, nor were the contents of it communicated to him by his partner. He had only been told of the assignment of claims on the *British* government, by a single obscure paragraph, crowded into a very long letter, written twelve years before; but, he had not been informed in what those claims consisted, nor to what extent the assignment covered them; and whatever the nature of the assignment might be, he was given to understand, that it was for the benefit of other persons, and houses, and that his house had but a very limited concern in it. If the paragraph of the letter had then been before him, he would not naturally have been led to suspect that the proceeds of the five vessels, mentioned in the schedule, were the very identical property alluded to. It is perfectly clear to my mind, that he was kept in entire ignorance of the real character of the order, and of the specific property to which it related, and of the receipt of any moneys under it. No man, as it would appear to me, who has duly attended to the history of this controversy, and to the facts in this case, can possibly entertain a doubt on

this point. *J. P. M.* had the best reason to suppose, and conclude, that all the moneys so received, had been truly received under the *trust deeds*, according to the uniform assertion of the defendant, and the joint order of the trustees upon *Mullett & Co.* The defendant did not deal with him frankly, and truly, as became a partner; and nothing would be more unjust than for the defendant now to avail himself of the ignorance or delusion of his co-partner, for which he is solely responsible, and which he was bound in duty to remove, and to make that ignorance or delusion a pretext to bar his representatives of their just rights. The first disclosure, by the defendant, of the order, and of the property which he received under it, was in the affidavit of *December*, 1817; but there is no evidence that *J. P. M.* had knowledge of that affidavit when he filed his bill. It is very clear, from the bill itself, that he had not; and it was not until after the first answer of the defendant, that *J. P. M.* became acquainted with the real nature and effect of the order. This is averred in the answer to the crossbill, and that answer being responsive to the bill, is evidence of the fact.

It is painful for me to be obliged to make or confirm a decree, which may, as suggested by one of the counsel for the defendant, be attended with a grievous loss to him and his family. But it is my bounden duty, (and the consciousness of that must be my consolation,) to pronounce strictly and truly upon rights, as they shall be made to appear, uninfluenced by personal considerations. And it is my clear and decided conviction, after bestowing due diligence to the study of the case, that *J. P. M.* had a vested interest, as a partner of the house of *M. & M.*, in the order in question, and a right to have it duly presented, and the proceeds covered by it, and received under it, faithfully applied. That his representatives are now entitled to require the defendant to account for that interest; and that when *J. P. M.* joined in the agreement and release to the

executors of *J. I. C.*, he acted in ignorance of the order, and of his rights under it. That his partner, the defendant, is chargeable with having wrongfully kept him in that state of ignorance, and that he, and not *J. P. M.*, or his representatives, ought, in justice and equity, to abide the consequences of it.

I am led to entertain a stronger opinion of the justice of the former decree, since the production of the letter, than I had before. If no notice whatever of the order had been attempted to be given, it might have been imputed to accident, or mistake, or forgetfulness. But to give a grossly inaccurate and deceptive account of the order, when it lay before him, was worse than no account of it, because it " led to bewilder," and has the appearance of design, and cannot well be imputed to accident or mistake. If I were to establish the sufficiency of such a notice, in such a case, and under all the surrounding and subsequent circumstances, and were to allow it to operate as the valid means of an enormous sacrifice of the vested rights of *Mumford*, I should be setting a dangerous precedent, and make the worst possible commentary upon the reciprocal rights and duties of mercantile partners. It would tend to banish confidence in the truth and frankness of their communications with each other, and destroy the necessity of a scrupulous adherence to those virtues.

I shall, accordingly, direct, that the former decree be, in all respects, confirmed.

Decree accordingly.