## BELL *vs.* BELL'S ADM'R.

[DETINUE FOR SLAVES, BY WIFE'S AGAINST HUSBAND'S ADMINISTRATOR.]

1. *Husband's marital rights; how affected by adultery, abandonment of wife, and intention that she should hold property as her own.*—The husband's marital rights attach, as against the surviving wife, to slaves which are delivered to her during the coverture, as her distributive share of a decedent's estate, although the husband, at the time of such delivery, had abandoned the wife, and was living in adultery with another woman, and so continued to live up to the time of his death; and although he never had the actual possession of the slaves, nor claimed them, but intended that his wife should hold and enjoy them as her separate property.

APPEAL from the Circuit Court of Wilcox.
Tried before the Hon. NAT. COOK.

THIS action was brought by James Raiford, as the administrator of Mrs. Lucy Bell, deceased, against Wm. C. Bell, to recover certain slaves, which the defendant held and claimed as the administrator of George W. Bell, deceased, who was in his lifetime the husband of the plaintiff's intestate; and was commenced on the 10th

March, 1858. The bill of exceptions purports to set out all the evidence that was adduced on the trial, but, under the decision of this court, it is unnecessary to state the evidence in detail. The material facts are the following : In 1816, in this State, George W. Bell married Lucy Raiford, then the widow of John Raiford, deceased, and lived with her, in Clarke county, until 1819 or 1820, when he left her and his family, and went to Mobile, where he died, intestate, in 1845. In 1823, Mrs. Bell removed to Wilcox county, carrying with her her five children,—three of whom were the children of her first husband, and two the children of said Bell; and she continued to reside there until her death, in 1855, and supported and educated her children without any assistance from her said husband. In 1826, the administrator of said John Raiford's estate delivered to Mrs. Bell, as her distributive share of the estate, a negro woman named Linda, who, with her increase since that time, is the subject of controversy in this suit; and these slaves remained in the uninterrupted possession of Mrs. Bell, who claimed and exercised control over them as her own property, up to the time of her death. In ———, 185—, after the death of Mrs. Bell, the defendant took out letters of administration on the estate of George W. Bell, claimed the said negroes as belonging to his intestates estate, took possession of them, and returned them in his inventory as belonging to the estate ; and letters of administration on the estate of Mrs. Bell were afterwards issued to the plaintiff. The plaintiff adduced evidence conducing to show, that George W. Bell, after leaving his family as above stated, never corresponded with his wife by letter, nor rendered her any pecuniary assistance, and that he lived in adultery in Mobile with two other women successively. On the other hand, the defendant's evidence tended to show, that Bell wrote to his wife several times, requesting her to come to Mobile; and that Mrs. Bell was prevented from following him by the relatives of her first husband, John Raiford, who were unwilling that she should carry with her said Raiford's children.

The court charged the jury, in writing, as follows: "1. If the jury find from the evidence that George Bell, the husband, before, and at the time his wife (plaintiff's intestate) got the possession of the slave Linda, was living apart from his said wife, and with another woman as man and wife, or in adultery; and that he continued to live apart from her, in that state, until his death, for the space of fifteen years or more; and that she had the open possession and control of said slave Linda, and of the children of Linda now in controversy, born after the wife's possession, and also the possession of the children of said George Bell, born of her own body by said Bell; and that she had the exclusive maintenance and support of said children, without any assistance from her said husband, and continued to possess and control the slaves in controversy, as her own, for eight or more years after-wards, and until her death; and that said George Bell did not, at any time in his life, and during his wife's possession as above stated, have possession or control of said slaves or their labor, or claim the same as his; and if they believe that said Bell never did [claim] or intend to claim said property, but intended that his wife should hold and enjoy the same to her own use, and as her own separate property,—then the defendant cannot, as his administrator, hold the property for his estate in this action under his intestate's title.".

This charge, to which the plaintiff excepted, together with other rulings of the court which require no particular notice, is now assigned as error.

L. S. LUDE, with whom were BYRD & MORGAN, for the appellant.—The rights of the parties in this case are to be determined by the common law, which considered the legal existence of the wife, during coverture, as entirely suspended, or incorporated and consolidated in that of her husband; in other words, it regarded a *feme covert* as having no legal identity, unless the matrimonial relation was annulled or suspended by some temporary disability cast on the husband.—1 Bla. Com. 442; 2 Kent's Com. 143; Broom's Com. 596; Walker v. Fenner, 28 Ala. 473.

So effectually does this rule operate, that the wife is disabled, during coverture, from either holding or recovering property without the intervention of trustees.—Carne v. Brice, 7 Mees. & W. 183; Smith v. Sheriff of Middlesex, 15 East, 609; Barlow v. Bishop, 1 East, 432: Glover v. Proprietors of Drury Lane, 2 Chitty, 117. It is a logical consequence of this principle, that marriage operates as an absolute gift to the husband of all personal property which is in the possession of the wife at the time of the marriage, or which comes into actual possession during the coverture.—Co. Litt. 300; Bell on Property of H. and W. vol. 1, p. 34. The husband acquires an immediate and absolute property therein, not only potentially, but in fact; not by any subsequent act of his, but *eo instanti* by operation of law; and it can never again revest in the wife, or her representatives.—Co. Litt. 351; 2 Bla. Com. 436; Andrews & Bro. v. Jones, 10 Ala. 422. As to the wife's choses in action, however, which are not capable of immediate tangible possession, marriage operates merely as a conditional gift ; the condition being, that they shall be reduced to possession during coverture.—Bell, § 51; 1 Bright, 36; Co. Litt. 351; Bibb v. McKinley, 9 Porter, 644.

At the time of the marriage between George W. and Lucy Bell, the latter had an undivided interest as distributee in the estate of John Raiford, deceased. This interest was then a mere chose in action, (Bibb v. McKinley, 9 Porter, 636; Mayfield v. Clifton, 3 Stewart, 380; Clancy on Married Women, 109;) but, under the authorities cited in the foregoing paragraph, the delivery of the slave Linda to Mrs. Bell, on the distribution of the estate in 1826, and her subsequent possession, vested the absolute property, by operation of law, in her husband; and his marital rights were not prevented from attaching by any or all of the facts hypothetically stated in the charge of the court—that is, (1st,) his abandonment of his wife, and subsequent adultery; (2d,) the fact that he never claimed, or intended to claim the property, but intended that his wife should hold and enjoy it as her separate property; and (3d,) the fact that he did not have the actual

Bell v. Bell's Adm'r.

possession, or exercise control over the slaves or their labor.

1. At common law, if the husband was banished, or had abjured the realm, an exception was allowed to the general rule as to the disability of the wife to contract, acquire property separate from her husband, or otherwise act as a *feme sole*. Prior to 1800, the English cases were not very consistent on the doctrine.—See them reviewed in 2 Kent's Com. 154–60. In Marshall v. Rutton, (8 Term R. 545,) before the twelve judges of England, it was decided, that a man and his wife cannot, by any act or agreement between themselves, change their legal capacities; nor can a married woman be treated as a feme sole, while the marriage relation continues to subsist, and she and her husband are living under the same government.—See, also, Marsh v. Hutchinson, 2 Bos. & P. 226; Wardell v. Gooch, 7 East, 582; Chambers v. Donaldson, 9 East, 471; Bogget v. Frier, 11 East, 301; 2 Chitty, 117; 15 East, 607. The reason of the rule is obviously to be found in the husband's common-law liability for necessaries furnished to the wife.—Broom's Com. 421; 1 Camp. 120; 3 B. & C. 635. The rule laid down in Marshall v. Rutton, *supra*, has been adopted in Alabama; and it has been held, that a married woman, whose husband has abjured the State, and who has since traded as a *feme sole*, and taken notes in her own name, may sue and recover on them.—Roland v. Logan, 18 Ala. 310; Mead v. Hughes, 15 Ala, 148; James v. Stewart, 9 Ala. 857; Arthur & Corprew v. Broadnax, 3 Ala. 557. But, under these decisions, to remove the disability of coverture from the wife, there must be an abandonment of her, and a removal from the State without an intention to return. Krebs v. O'Grady, 23 Ala. 731; Parker v. Lambert, 31 Ala. 91; also, Wells v. Thompson, 13. Ala. 803. These authorities show, that the husband's adultery and abandonment of his wife, unsanctioned by a divorce, and without an abjuration of the State, did not enable the wife to act as a *feme sole*, nor prevent the husband's marital rights from attaching to her property.

2. Although this court has gone to an extreme length,

Bell v. Bell's Adm'r.

in protecting the claims of widows against the legal representatives of their husbands; yet no case can be found which countenances the proposition, that the husband's simple intention that his wife should have property, prevented his marital rights from attaching to it. The charge of the court in this case, in effect, instructed the jury, that a separate estate in the wife could be created by her acts in claiming and using the property, and her husband's intention that she should so hold and claim it. The error of this proposition is shown by numerous decisions of this court, some of which are cited for the appellee.—Gamble v. Gamble, 11 Ala. 972; Machem v. Machem, 15 Ala. 376; S. C., 28 Ala. 382; Bradford v. Goldsborough, 15 Ala. 316; Williams v. Maull, 20 Ala. 730; Frierson v. Frierson, 21 Ala. 565; Irons v. Reynolds, 28 Ala. 309; 31 Ala. 91.

3. The error of the third proposition involved in the charge, as above stated, is conclusively shown by the numerous cases in which constructive possession by the husband has been held sufficient in law to cause his marital rights to attach to the wife's property.—Magee v. Toland, 8 Porter, 37; Pitts v. Curtis, 4 Ala. 351; Broom v. King, 10 Ala. 821; Machem v. Machem, 15 Ala. 377; McDaniel v. Whitman, 16 Ala. 345; Chambers v. Perry, 17 Ala. 730; Hopper v. McWhorter, 18 Ala. 231; Gibson v. Land, 27 Ala. 126; Walker v. Fenner, 28 Ala. 373; 2 J. J. Mar. 82; 1 Missouri, 667; 2 C. M. & R. (Eng. Ex.) 699; 2 Story's Equity, § 1404; 10 Sim. 254; 7 M. & W. 183.

WATTS, JUDGE & JACKSON, contra.—1. At the time of Lucy Raiford's marriage with Bell, her interest in the estate of Raiford was not property in her possession, either actual or constructive, but was simply an equitable chose in action, the legal title to the slaves being in the estate of Raiford.—Brasher v. Williams, 10 Ala. 630; Kelly v. Kelly, 9 Ala. 906; Miller v. Eatman, 11 Ala. 609; Johnson & Co. v. Spaight, 14 Ala. 27; Andrews & Bro. v. Jones, 10 Ala. 400; Schuyler v. Hoyle, 5 Johns. Ch. 205; Galligo v. Galligo, 2 Brock. 285; Bibb v. Mc-

Kinley, 9 Porter, 636. Bell acquired, by virtue of the marriage, simply the right to reduce this equitable chose in action into his possession during coverture; and when he reduced it to his possession as husband, but not till then, his marital rights attached to it.—Clancy on Husband and Wife, 4; Bibb v. McKinley, and other authorities above cited.

2. Did Bell ever reduce this property into his possession as husband? Not only did he never have the actual possession, but there is no evidence that he ever knew his wife had the possession. He never asserted any right to the property, and never did any act indicating an intention to claim or exercise dominion over it. There is no evidence that his wife acted as his agent in receiving the property, or that he ever ratified her act by word or deed. She always claimed the property as her own, and exercised dominion over it as her separate property; and if her husband ever knew anything about the property whilst it was in her possession, he acquiesced in her assertion of title. To constitute a reduction to possession by the husband, such as will defeat the wife's right of survivorship, there must be some act on his part to change the property in the chose in action: something must be done by him to divest his wife's right and perfect his own; there must be some act of dominion, in the character of husband, over the chose in action. In the language of Chancellor Kent, "The property must come under the actual control and possession of the husband, quasi husband, or the wife will take as survivor."—2 Kent's Com. 138; Roper on Husband and Wife, 132–33; Wildman v. Wildman, 9 Vesey, 174; Johnson & Co. v. Spaight, 14 Ala. 27; Whitworth v. Hart, 22 Ala. 358; McNeill v. Mason, 23 Ala. 201; Jennings v. Blocker, 25 Ala. 415; Machem v. Machem, 28 Ala. 374; Gillespie v. Burleson, 28 Ala. 551; Lockhart v. Cameron, 29 Ala. 375; Planters' Bank v. Davis, 31 Ala. 632. In Machem v. Machem, supra, the wife was in possession of property, and was living under the same roof with her husband; and yet, because he neither did nor said anything which amounted to the exercise of dominion over it as husband, his marital rights were held

not to have attached. In Whitworth v. Hart, also, the husband and wife lived under the same roof, and the property in controversy was in their actual possession; but, because no acts or declarations of the husband were shown, by which it clearly appeared that he asserted his dominion over it as husband, his marital rights were held not to have attached. It is admitted that, *after* the husband has reduced the property to his possession, something more than a mere unexecuted intention on his part is necessary to vest title in the wife; but the authorities above cited conclusively show that, under the facts of this case, the property never was reduced to possession by the husband.

3. The abandonment of the wife by the husband, under the circumstances disclosed by the record, would prevent her possession from being his possession, and thus show that his marital rights never attached to the slaves.—Mead v. Hughes, 15 Ala. 145; Cecil & Juxon v. Juxon, 1 Atk. 278; 17 Serg. & R. 132; 4 Johns. Ch. 317.

A. J. WALKER, C. J.—The title to the property in controversy, at a date anterior to the adoption of any of our statutes concerning the separate estates of married women, is the subject of inquiry. Those statutes are, therefore, excluded from view in the discussion of the questions of this case.

It is a general rule of law, that the wife's possession of chattels is the husband's possession, and that the husband's property in the wife's chattels springs into existence with the commencement of her possession during the coverture, as if the manucaption had been his instead of hers. Clancy, in his work on Husband and Wife, states, that, as a general rule, the wife cannot possess personal property; that, as far back as English jurisprudence could be traced, marriage conferred on the husband dominion over the possession of the wife; that, in the contemplation of law, the wife is scarcely considered to have a separate existence; that the unity of the persons of husband and wife is the source whence the wife's disability to possess personal property is derived, and that the

husband takes the wife's chattels, which come into the wife's possession in her own right, whether it be by gift, or bequest, or in any other way.—Clancy on Husband and Wife, 1–2–3. And it has been decided by this court, that because the legal existence of the wife is merged in that of her husband, a delivery to the wife is a delivery to the husband, and the possession of the wife is the possession of the husband.—Machem v. Machem, 15 Ala. 373; McDaniel v. Whitman, 16 Ala. 343; Mason v. Mc-Neill, 23 Ala. 201, 214–217; Walker v. Fenner, 28 Ala. 367; Magee v. Toland, 8 Porter, 36–42. There are de-disions, which distinguish the effect of the wife's con-structive possession, as implied from the holding of another for her, as her guardian, bailee, and the like, in the cases where the wife survives, from its effect when the husband survives. But such distinction does not belong to cases where the wife had actual possession, and it has never been made in such cases. A consideration of the cases making that distinction would, therefore, be altogether out of place in this case.

The marriage-tie between George W. Bell and Lucy Bell was subsisting when the latter went into the actual possession of the slave Linda; and by virtue of that pos-session, upon the principle hereinabove stated, the hus-band became the owner of the slave, unless something in the relation and attitude of the husband and wife towards each other, or in the conduct of the husband, excepts the case from the operation of the general rule. The first charge given by the court below is predicated upon the supposition, that an exclusion of the marital rights re-sults, and an exception to the general rule prevails, when the husband, long before the wife's possession, lived apart, and in complete estrangement from his wife and family, in an adulterous connection, and so continued to live until his death many years afterwards, and never had or claimed possession of the property, and intended never to claim it, but intended that his wife should hold and enjoy it as her separate estate. The conclusion expressed in the charge is put upon the finding of two distinct matters, which seem to derive no force from their union,

and presents these two points of investigation—what is the effect of the husband's separation from his wife, and his adultery? and what is the effect of his intentional leaving of the property to the exclusive enjoyment and control of his wife, separated from him, coupled with the intention that she should have a separate estate in it?

What would be the effect of the husband's separation from his wife and his adultery, if accompanied by a permanent abandonment of the State, is not the question to be decided. The abandonment of the State is not within the hypothesis of the charge, and, indeed, is not shown by the evidence. In the cases which concede to the wife, who has been deserted by her husband, the privileges of contracting and suing as a *feme sole*, the husband had either permanently abandoned the State, or had been banished, or had never resided in the State; and they are expressly put upon the ground of the husband's non-residence.—Arthur & Corprew v. Broadnax, 3 Ala. 557; James v. Stewart & Rainey, 9 *ib.* 855; Mead v. Hughes, 15 *ib.* 139; Krebs v. O'Grady, 23 *ib.* 726; Roland v. Logan, 18 *ib.* 307; Gregory v. Pierce, 4 Metc. 478; Abbot v. Bailey, 6 Pick. 89; Gregory v. Paul, 15 Mass. 31; Smith v. Silence, 4 Iowa, 321. The principle of these cases is, that to relieve the wife of the disabilities of coverture, and to free her from the operation of the common-law doctrine of the merger of her legal existence in that of her husband, which controls almost every question of marital right and obligation, there must be something deemed analogous to an abjuration of the realm. These cases give no sanction to the proposition, that desertion, cruelty, adultery, or any other like cause, can, of itself, deprive the husband of his rights, or reinvest the wife with the powers of a *feme sole*.

Our decisions have infringed, to some extent, the rigid rule of the common law, that to invest the wife with the capacity of a *feme sole*, there must be a banishment of the husband, or an abandonment of the country for life without the privilege of returning, or transportation for a certain number of years; but this court has evidenced no inclination to depart from the common-law rule farther

than is above indicated.—See the cases above cited; also Clancy on H. & W. book 1, ch. 4, p. 54; 2 Bright on H. & W. 69–70; Bell on H. & W. 34–85.

In Massachusetts it has been decided, that the wife was not reinvested with the privileges of a *feme sole*, when her husband lived apart from her, in another town, in adultery, and she carried on trade on her own account. Russell v. Brooks, 7 Pick. 65. In the case of Altemus, (1 Ash. 49,) it was held in Pennsylvania, that a husband was not deprived of the right of administration upon the estate of his deceased wife, on account of his cruel and barbarous treatment of her, and his abandonment of her many years before her death. In the case of Abbot v. Bayley, (6 Pick. 89,) where it was replied to the plea of coverture, that the husband had, about eighteen years before, driven the plaintiff from his house by cruel treatment, and had since lived in adultery in one State, while the wife maintained herself in another, it was said, that if the parties had lived in the same State, it was certain that the facts stated in the replication would not have avoided the plea of coverture.

It is now well settled, both in England and America, that where husband and wife live apart by agreement, the wife has no right to sue and be sued as a *feme sole*, and the husband's interest in her property is not affected. 2 Kent's Com. (m. pp.) 154 to 162; Ames v. Chew, 5 Metcalf, 320. In England, the doctrine is, that a divorce *a mensa et thoro* does not confer upon the wife a capacity to sue and be sued.—Lewis v. Lee, 3 B. & C. 291. And in Pennsylvania the same doctrine seems to have been held. Clark v. Clark, 6 Watts & Ser. 85. In Massachusetts, the capacity to sue and be sued is conceded to a woman divorced *a mensa et thoro;* but it is put expressly upon the ground, that the separation is sanctioned by the law. Dean v. Richmond, 5 Pick. 461. The doctrine of this Massachusetts decision has the approval of Chancellor Kent, who intimates, that it might with propriety be extended, so as to include the case of the wife of a husband imprisoned for crime.—2 Kent's Com. (m. p.) 158. In this State, it has been decided, that a divorce *a mensa et*

*thoro* does not affect the husband's right as tenant by the curtesy; and that the separation of a husband from his wife does not take away the right of reducing her property to possession.—Smoot & Nicholson v. Lecatt, 1 St. 590; Thrasher v. Ingram, 32 Ala. 645. And it is held in England, that a husband, from whom there is a divorce *causa adulterii*, may release the wife's legacy.—Stephens v. Totty, 1 Cro. Eliz. 908; Chamberlain v. Hewson, 5 Mod. 70 ; Gilchrist v. Brown, 4 Term, 766 ; Bishop on M. & D. §§ 682, 683. In the same country it is decided, that the husband's abandonment of his wife, and living in adultery in the same city, is not a sufficient reason for the court's granting her leave to convey her property without his concurrence.—*Ex parte* Parker, 30 Eng. L. & Eq. 493. In Hyde v. Price, (3 Vesey, 437,) and the cases there cited and commented on, it is very conclusively shown, that the doctrine, that the husband's abandonment and adultery divests him of his interest in his wife's property, has no place in the English law.

In Kentucky, the court, in maintaining the strict rule of the common law, has regarded the wife as subject to all the disabilities of coverture, notwithstanding the husband lived apart from her in another State.—Tuttle v. Maney, 2 J. J. Mar. 82. See, also, Fuller v. Bartlett, 41 Maine, 241; Harris v. Taylor, 3 Sneed, 536.

In the State of Ohio, it has been held, that a wife, driven from home by the husband's cruelty, and living and maintaining herself separately from him, and having separate property decreed to her as alimony, may sue in respect to that property, at law, as a *feme sole*.—Benadum v. Pratt, 1 Ohio St. 403 ; Wagg v. Gibbons, 5 Ohio St. R. 580. This decision in Ohio involves a departure from the established law, and assumes the province of the legislature in giving a new characteristic to the matrimonial *status;* unless it can be maintained upon the ground, that the property to which the suit related was secured to her as alimony.—2 Comyn's D. 238, *Baron and Feme*, O.; 1 Salk. 115. In Illinois, it has been said, in the reasoning of the court, that, if a husband compels his wife to live separate from him permanently, without her fault, and

fails to make a suitable provision for her support, she may acquire property, control it and her person, contract, sue and be sued as a *feme sole*, during the continuance of such condition.—Love v. Moyncham, 16 Illinois, 277; also, Prescott v. Fisher, 22 Ill. 390.

There is a class of cases, of undisputed authority, which assert that a wife, who carries on trade upon her own account, with her husband's consent, will, in equity, hold her earnings as a separate estate.—Pinkston v. McLemore, 31 Ala. 266 : 2 Bright on H. and W., 299; 2 Roper on H. and W., 171, 172. So, also, it is a doctrine of equity, that if the husband desert the wife, her earnings during the desertion will be treated as her separate estate. 2 Roper on H. and W., 172, 173; 2 Bright on H. and W., 299, 300, §§ 17, 18, 19 ; Cecil v. Juxon, 1 Atk. 178. This last named doctrine rests upon the principle, that he who has abandoned his wife, and left her without a support, must be presumed to consent that she shall have the earnings of her industry, and not intend that she shall starve. Roper puts the doctine upon that principle; and the two cases of Cecil v. Juxon, (*supra*,) and Lamphir v. Creed, (8 Vesey, 599,) are thus harmonized ; for, in the former, there was the element of abandonment, from which the husband's consent to the wife's carrying on trade on her own account could be inferred ; while in the latter, that element was wanting.—2 Roper on H. and W., 172, 173, 174. In Bell on Property of H. and W., 287, 288, the doctrine is referred to the same principle. The presumption from the husband's abandonment is, that he consents for his wife to have *the fruits of her industry ;* not that she shall have property coming to her as a distributee. The principle upon which the doctrine rests, shows that it has no application in this case, and that it is altogether misapplied by the counsel who rest upon it a vindication of the charge of the court below.

The decision in Starrett v. Wynn, (17 S. & R. 130,) referred to by the counsel for the appellee, seems from the opinion to have been made in reference to the property acquired by the wife during the period of the husband's desertion ; and as courts of law in Pennsylvania (there

being no chancery court) enforce equitable rights, the decision may be referred to the equitable doctrine, that an abandoned wife is entitled to her earnings. It is quoted as an authority to that effect by Chancellor Kent, (2 Kent's Com. 164,) and it is only when viewed in that light that it can be considered as an authority supported by any sound principle. We confess, however, that an examination of Knapp v. Scholl, (10 Penn. St. R. 193,) and Bonslaugh v. Bonslaugh, (17 S. & R. 361,) in connection with Starrett v. Wynn, (*supra*,) inclines us to think, that in Pennsylvania, the husband's abandonment of his wife is regarded as depriving him of his marital right in her property.

There is, also, a class of cases, in which a court of equity lays hold of the wife's equitable property coming within its reach, and out of it makes provision for her maintenance, where the husband has deserted or mistreated her. There seems to be no fixed rule as to the amount of provision to be made for the wife in such cases; but where the abandonment of the wife was total and permanent, the chancellor has gone to the extent of appropriating the wife's entire property coming within his power to her maintenance.—Drummond v. McGee, 4 Johns. Ch. R. 318; Bell on Property of H. and W., 137, 138; 2 Story's Eq. Ju. § 1424; Wildman v. Wildman, 9 Vesey, 174; 2 Kent's Com. 140; Kenny v. Udall, 5 Johns. Ch. 464. But this class of cases can have no application, where the title of the husband has been perfected by the reduction of the property into the actual possession of the wife pending the coverture.

This extended collation of the authorities indicates the existence of some decisions, which would sustain the position, that the marital right of Bell never attached, in consequence of his desertion of his wife, and his adultery; but the great weight of authority in this country, and the rulings of all the courts in England, and the opinions of the text-writers, are the other way. And besides, such a doctrine is at variance with the common-law theory of the marriage relation. It would attach to a voluntary separation on the husband's part all the consequences of a

divorce *a vinculo*, so far as the wife's capacity to contract, to sue and be sued, and to acquire property, is concerned. It would deprive the husband of his interest, *jure mariti*, in his wife's property, while he remains liable for her maintenance. It would free the wife from all the disabilities of coverture, while all the legal remedies for enforcing against the husband his liabilities and responsibilities remained open. It would deprive the husband of all interest in the wife's property, but leave her right to dower and a distributive share in his estate unaffected. We cannot follow the authority in favor of that position, and must decide, that the desertion and infidelity of Bell did not prevent his marital right from attaching to the property in question.

We now come to the second point of inquiry growing out of the first charge given, which is as to the effect of the intentional leaving by the husband of the property to the exclusive control and enjoyment of the wife, separated from him, coupled with the intention that she should have a separate estate in it. In the outset of this opinion, we adduced the authorities which establish that the failure of the husband to take the control of the property, his wife being in possession, could not prevent the vesting of his right, because the possession of the wife is the possession of the husband. This leaves nothing to be considered in reference to this last point, save the effect of the husband's intention that his wife should have a separate estate. If the marital rights of the husband attached upon the reduction of the slave into the wife's possession, it remained the property of the husband, unless he subsequently gave it to the wife. It seems that such a gift was not made, and if it had been made, it could only be available in equity. The question is reduced to this, whether the husband's rights attached; and that depends upon the other question, whether the husband's intention that his right should not vest, and that his wife should have a separate estate, is sufficient to exclude the right *jure mariti*, and invest the wife with a separate estate. In the examination of this question, we need not look beyond the decisions of our predecessors in this court; for

there is, perhaps, no country where this subject has been more thoroughly examined.

The case of Puryear v. Puryear, (12 Ala. 13,) was an action by the husband's representative, to recover money, arising from the hire of a negro, which the wife had hired out, in her own name, with her husband's consent. A part of the money had been received by the husband, and paid over to her by him. The husband declared the slave to be hers, and recognized her right to lend out the money, and to receive payment of it. These positive acts of the husband were held sufficient to show a gift by the husband to the wife. The decision is not based upon a bare intention of the husband that the wife should have the property, but upon acts amounting to a gift. In the case of Machem v. Machem, as reported in 28 Ala. 374, the decision that the husband did not reduce the property to possession *as husband,* and that the wife took a separate estate, is placed upon the ground, that the delivery to the wife was qualified, as being made for her separately from her husband, by his positive direction or consent. The same position is taken in Jennings v. Blocker, (25 Ala. 415,) where it is said, that the husband " may repudiate all claim as husband to property given to the wife, and elect to treat it as hers, and hold or control it as her trustee; and if this election is made before the right or title is vested in him, and the coverture is determined while it is so held, his marital rights cannot be asserted afterwards to it." In that case, the receipt of the property was accompanied by the consent of the husband that it should be the wife's, and should be held as hers. In Gillespie v. Burleson, (28 Ala 551,) a similar question arose, and it was clearly signified, that the husband's consent, given at the time of the delivery of a slave to the wife, was necessary, to so qualify the delivery as to exclude his marital right. In Lockhart v. Cameron, (29 Ala. 355,) the principle was thus announced: "When the husband *receives* the property *as the separate property of the wife,*" and holds it openly and avowedly in the same right during the continuance of the coverture, " his right to the property never does attach, because he never re-

duced it to possession as husband." The authorities thus collated suffice to show, that in all the cases where the husband has been excluded from the ownership of the wife's property during the coverture, it has been upon the ground of his positive assent to that exclusion, qualifying the delivery or reduction to possession. There is no case, in which the mere intent of the husband that the wife should have a separate estate in the property, has been held to take away his right as husband. The husband has a positive right to the chattels of the wife reduced to possession, and he is not divested of that right by a mere unexecuted intention so to divest himself. It is not enough that the husband intends not to claim his right. He must actually and positively assent to his exclusion. We understand the first charge to assert the contrary doctrine, and we must declare it to be erroneous in doing so.

The delivery of the slave Linda to Mrs. Bell, as her distributive share in her husband's estate, by the administrator of that estate, vested such legal title as belonged to the estate ; and it was competent to prove the contents of the burnt record.

We do not deem it necessary to notice the other questions presented.

Judgment reversed, and cause remanded.